The next case, number 182147, United States v. Jamie L. Melo. Good morning, Your Honor. May it please the Court, Gary Pelletier for Jamie Melo. I'd like to reserve three minutes for rebuttal. Yes. Your Honor, there are several issues of error that we've raised in that brief, and I'll start with the issue of the District Court committing reversible error when the Court failed to grant his motion to suppress the custodial statements, or the statements we contend were custodial, where the agents admittedly did not administer the prophylactic warnings under Miranda v. Arizona. We have a situation here where there's an analysis, and the analysis included several factors that the Court did address. There were several other factors that the Court simply did not address and ignored, and there are very significant legal issues in terms of what was actually communicated to Mr. Melo and how that impacts on this. And at the outset, I'd like to note that in accordance with the United States v. Lanny, the District Court here said this was a very close call. But the factors that the Court addressed in this close call, there were several things that occurred here. Some of these things were something that the District Court acknowledged. He was held at the dining room table. He largely could not move about the apartment or his home after the interview started. What's been hard for me to not accept is the fact that his attorney, even though not physically present, was on the phone during this entire interview, and I'm just hard-pressed to understand if he was under such duress, why his attorney just didn't tell him to shut up or leave. I think that part of the problem was the attorney actually asked two questions to the agents. One is somewhat in dispute in this case. The two questions he asked are, is my client a target of this investigation? The second question he asked is, is my client definitely going to be arrested? The second question is the one that's in dispute that the judge found murky. She didn't address Attorney Zajac's testimony on this, didn't credit her or not credit her or say anything about that. Mr. Mello testified that when he heard that statement, he didn't feel free to leave. Attorney Zajac indicated that he's not going to have his client leave because that may be at that point when he's being told he's going to be arrested unless he cooperates. Then he doesn't feel free to leave at that point. The other part that was out— Could you just, on the lawyer question answer, the lawyer supposedly says if he doesn't cooperate, then he's going to be arrested or something like that, right? What's the exact—? The attorney asked the question, two questions. He asked, is my client a target of this investigation? And the answer to that is yes. Yes, and that's undisputed. Everyone, the agents, the attorneys, Mr. Mello, everyone acknowledges that occurred. The second question that was asked is, is my client definitely going to be arrested? And the answer to that that Mr. Zajac gave and Mr. Mello gave is that that depends on whether he cooperates and how he answers our questions. At that point, it was Mr. Mello—Mr. Zajac, Mr. Mello did not believe Mr. Mello was free to leave, and Mr. Mello formed that as a subjective opinion as well as, I believe, it's objectively reasonable under the circumstances. But the lawyer asked whether he's going to be arrested if he doesn't cooperate. He asked, is he definitely going to be arrested? And the agents indicated that depends on whether he cooperates and how he answers our questions. Okay, and that's according to the testimony of the lawyer. According to the testimony of the attorney and Mr. Mello. And the record shows that the officers don't recall the question being asked? Don't recall the question. So I believe the district court indicated that they said that it— But they also testified that they didn't respond in the way that the lawyer said they responded, correct? I don't recall that. What I recall is that they indicated that they didn't recall that question. That question was asked to them. Aren't they later asked whether they said he would be arrested if he didn't cooperate? And they said, no, they didn't say that? Initially, they said that they didn't say that, and then the question was put to them again. And the question was asked, are you saying this didn't happen or you don't recall? And they said, I don't recall. So you're not saying it didn't happen? No, I'm saying I don't recall. So are you asking us to make a clear error finding on that question? Well, that's part of it. I understand the argument that if that question was asked and the answer was given that the lawyer said was given, that would certainly help your argument for saying that he was in custody. It would. But the district court did not find for you that that was said and that the answer was given, right? The district court found that that was murky, is what she said, because she said that they were – So are you asking us to say it was clear error not to find that it actually was said? What I'm asking is that in terms of her analysis, that she didn't address Mr. Zajac's question. What do you want us to do, vacate and remand for her to make a finding on that question? If the court believes that's the proper – Is that the only thing you're asking us to do, or are you asking us to say it was clear error and that we should find – I'm asking for clear error, but if the court believes that the record is unclear on that, that she never discussed Attorney Zajac's testimony and they have no way to find whether he – there was no credibility determination made. There is a clear error here that I believe, because she indicated that the agents said this didn't happen. And as I just indicated, the agents didn't say that. They were equivocal. Attorney Zajac was not equivocal. He was very unequivocal. This is what was said. The agents didn't say anything in terms of it being something that definitely happened. They simply said they didn't recall. So you have this equivocating statement from the agents, which she doesn't analyze, doesn't even look at that, doesn't mention that, versus this unequivocal statement from the attorney. And I'm not saying the attorney should be given more weight. That's not what I'm arguing. I'm simply saying that you have a situation here where you have a court wrongfully finding that the agents were unequivocal and they weren't. They were very equivocal. And you counteract that against an unequivocal statement from an attorney. And I suggest that that's where the clear error is. That's either clear error or if it's ambiguous as to how she analyzed Attorney Zajac's testimony, then I would think that would have to be remanded on that point. And I take it you'd say even if we conclude that we don't have to vacate and it wasn't clear error on that, nonetheless you still win. Yes, because here's another part of this analysis that was never considered by the court, which is regardless of the attorney, that second question, the first question is major. The first question is, is he a target of the investigation? That becomes coercive. That becomes custodial. Stansbury v. California talked about this very issue. And it talks about if something is not communicated, then it's not something the subject of intent of the agents is irrelevant. But there's no question it was communicated. This court has looked at that issue. The district courts have looked at that issue and said if it's not communicated, fine. But this is a situation where the fact that he was a target was communicated. And you take that. That's coercive in and of itself. Now I know my client is a target of this investigation. And I would submit that it's logical that an attorney would follow up with that question about whether he's going to be arrested. But putting that aside, my client is a target of this investigation. And you combine it with all the other factors, some of which the district court addressed, some of it we didn't. I mean, there were certain things in here the district court noted. He may have not been able to get his diabetes medication. Well, shouldn't there be a finding on that as part of its analysis? What's the significance of Judge Thompson's question about the fact that there's an attorney present for him? That is an unusual feature of a supposedly custodial interrogation, isn't it? I mean, the fact of, I don't think that makes it non-custodial. And the fact is Miranda, if he's in custody, is supposed to be given regardless of whether an attorney. That's not the criteria. But the fact is that we have a situation here where I submit that it becomes more custodial. Because even though the attorney is present, now he's been told at the very least his client is a target of the investigation. Now he can't leave. Now he can't do anything because he's now been told he's a target. And so that in and of itself, combined with the other factors, puts it in a situation where a reasonable person is not going to feel they're free to leave under those circumstances. And that becomes part of the issue when you consider that. You consider the fact that there was testimony from Agent Ryan that he was not allowed to go up and get a glass of water because they were afraid of knives. Although Agent Polly never testified to that at all. We have that, him watching him go to the bathroom. All those factors together create a custodial interrogation, him separating him from his wife, the other agent in the house. That would not have been known to him, right? I'm sorry? That would not have been known to him. That may not have, but certainly the fact that his cell phone was taken and he lost communication with the outside world was known to him. And all those factors together, and then you combine that, you combine that with the fact that he's now been told at the very least that he's a target of the investigation. I think that's where it renders this custodial. And that becomes, with the custodial interrogation, then that's when they should have applied in the midst of the Miranda warnings. So is it your position that being a target equates to being in custody? A target in and of itself, I don't believe under Stansbury would make it, in and of itself would make that. But it's the target combined with the other factors. And the district court here said it's a close call, but never addressed the question of the target and how that factors into the analysis. And so that's the issue. We have all these factors suggesting potential custodial interrogation. And then we counterbalance. Okay, well, what are the other factors that would apply? Well, obviously if he's been told he's being arrested, it's a pretty major factor. But the fact is that he's been told he's a target. You combine that with all those factors, and that's what creates the custody. That's what creates the custodial interrogation. What's the record show about why the cell phone was taken? I'm sorry, you said the cell phone was taken? The cell phone was taken. He turned over the cell phone to allow the cell phone and his computers to be analyzed by the agents. So the two agents that came into his home or whatever, they weren't actual agents, but Mr. Mello didn't necessarily know that. They were working on the cell phone. They were working on the cell phone and the computer. So they had his cell phone and they had his computer at the time. This wasn't something that they did after they arrested him. It was done during the interrogation itself. So they took his cell phone, which essentially had the effect of isolating him. So he gave them the cell phone upon their asking for it? Upon their asking, he agreed to that. It was done when Attorney Zajac was not on the phone, but he did do that. He gave that to the agents, and essentially that cut off his contact with his wife or with the outside world at that point, during that custodial. During the interrogation itself, the three hour, four hour time he was there. If my little remaining time, I'd just like to address one of the other issues that I raised, which is the admission of phone records that predated any evidence of the conspiracy in this case. The conspiracy was alleged to have occurred from October to December. There were 120 phone calls that were enlisted there. I believe that constitutes bad character evidence. There's no reason whatsoever for phone records like that to come in, into a case like this when it predates the existence of the conspiracy. The only reason is to try to make him look like he's in league with two other, two nefarious characters. I see my time's up. Thank you. Before you sit down, did the trial attorney argue that the phone calls better represent planning for the Thanksgiving trip? I don't recall that. Are you asking if the government asked that or the defense attorney? I know the government's not going to argue that. Did the defense argue that? I believe it was argued. In other words, there were legitimate reasons for these parties to have been calling one another. There absolutely were. I don't think that was presented, if that was argued to the jury. I don't remember if it was argued exactly that way. I do remember that the fact that those phone calls were being presented, that there were 200-something phone calls between them, it was always a matter of fact that he worked with Antonio Freitas at the Bristol House of Corrections and that he also knew Carlos Rafael, who was a person in the community. That was never contested. But the argument was that you take these phone calls and you take them out of context. They're not phone calls with any type of context to them. They're not text messages. There's no recordings. You just have phone calls. The phone calls just completely predate the conspiracy itself. There's just no reason for that. None that ever should be put in evidence to putting in phone calls from March through September, which have nothing to do with this particular case. Even October and December, the court ruled that other evidence was not admissible after November 10, 2015, so I'm not sure why that would be admissible. And there was no true evidence of a conspiracy in October, but certainly there was no evidence of anything from March to September, and that creates the issue. It's just purely bad character evidence, and the court should, and this is not a case where that error could ever be harmless based on the facts in this case. Thank you, Your Honor. Chief Judge Howard, may it please the Court, Mark Quinlivan on behalf of the United States. Let me start with the suppression issue, and I do want to go through all of the factors that the district court considered, and then I'll turn to the discrepancy in the testimony about whether or not the agents informed the defendant and Mr. Zajac that the defendant would be arrested if he did not cooperate. This court has identified a number of factors that you look to in determining whether it's a custodial interrogation, and the district court considered all of them. First, you look to whether or not the interrogation or the interview took place in a neutral or a familiar surroundings. Well, this wasn't just a neutral surrounding for the defendant. It was his own home, as familiar a surrounding as one could have. Second, courts look at the number of agents involved in questioning of the defendant. In this case, it was two agents, Agent Polly and Agent Ryan, and in analogous circumstances, this court has said that where there's a limited number of officers or agents questioning, that is indicative of a non-custodial interrogation. The agents never brandished their weapons. They never restrained the defendant in any way. He was able to get up and get some water. What about the fact that he was a target? Well, Judge Thompson, I don't think that that plays a significant role in the analysis. From what I understand, my friend's argument to me, it sounds like he's almost arguing for a bright-line rule that if an agent tells somebody they're a target of the investigation, that that's indicative of a custodial investigation. I'm not aware of any case that supports that proposition. When the agent, Mr. Zajac, did ask that question, is Mr. Mello a target of the investigation, Agent Polly said yes. At that point, Mr. Zajac could have cut off the questioning immediately, or if the defendant felt uncomfortable, he could have asked to have consulted with Mr. Zajac privately. That's true if it was custodial also. That's correct. The significance of the fact that he could cut it off is neither here nor there. I guess I'd just flip it around, Judge Barron. The fact that rather than doing that, the interview continued for a significant amount of time. If there had been Miranda, then you'd have a good waiver argument. If there isn't Miranda, that can't be relevant either. The fact that he continues to talk in the absence of a Miranda violation can't be evidence it's not custodial. No, I'm not making that across-the-board argument. I'm just saying that you take the totality of the circumstances into consideration. But is one of them the fact that he kept talking? That's a relevant factor to whether it was custodial? I'm not pushing that far. I'm just saying that, Judge Barron, I'm countering my friend's argument that once he was informed that he was a target of the investigation, they had no course but to continue on. He says that in addition to that, they had taken his weapon. They had begun a search of his belongings. When he got up from the table, they followed him down the hall to the bathroom. Let me take those one by one. First off, with respect to the consent to search, courts have said that when one consents to search, that's not a self-incriminating statement, and therefore a request to search isn't interrogation. In our view, that doesn't play any role. The defendant consented to the search. The fact that the search activity is going on might be relevant to whether it's custodial, even if the search request is not interrogation, right? I don't believe so. No. No, because it's a question of whether it's a custodial interrogation. Yes. The request to search, that isn't even interrogation to begin with. So I don't think the fact that they asked him to consent to a search plays any role. You don't think the fact that that's going on at the time might contribute to the idea that he feels like he's in custody, so that when they ask him interrogation, questions that would count as interrogation, that would then constitute custodial interrogation? Do you see what I'm saying? I see what you're saying. The atmosphere isn't just some people coming to chat. They told him you're a target. Now we've got people coming in who want to actually do search of your belongings. That's actually not the sequence, Judge Barron. So the sequence is they arrived at the residence at approximately 8.30 in the morning. They identified themselves. They said that they wanted to ask the defendant questions about possible criminal involvement with Mr. Raphael. The defendant said he wanted to have his attorney present. There was some back and forth about how that would be arranged, and there was a mutually agreed that Mr. Zajac would call in at 9.30. The agents then asked to consent to the search. The defendant consented to the search, as the district court found, which was consistent with his intent to cooperate with the agents. And then at 9.30, Mr. Zajac comes on the phone, and the questioning begins. And at the outset of the questioning, Mr. Zajac asks, is the defendant a target of the investigation? And Agent Pauly says, yes. And then it continues on. The fact that Mr. Zajac was on the phone for the entirety of the questioning, as the court found, at certain points he had to attend to other business, at which point the questioning stopped. The questioning was, by all accounts, very— A defense counsel says that it doesn't matter that the attorney was present in terms of how we evaluate the custodial question. What is your position on that? I think the district court quite rightly found that it was a significant factor suggesting that it was non-custodial, because the agent succeeded to his request to have his attorney present. And in analogous circumstances, courts have found that to be a factor that is indicative of a non-custodial interrogation. In addition, as I pointed out, at no point in the questioning, or at every point in the questioning, Mr. Zajac was on the phone. As I noted, it was cordial until the very end, and yet at no point did either the defendant or Mr. Zajac ask to terminate the interview. Judge Barron, going back to your question about— The defendant was actually, as the court found, he actually got up himself to get himself a glass of water on a couple of occasions. Although Agent Ryan accompanied him to secure one of the firearms in a back bedroom, the defendant went to the garage to secure his dog and was not followed into the garage. He was allowed to go in there himself to secure the dog. The agents testified, and the court credited their testimony, that at no time was he told that he wasn't free to leave the table. With respect to the point on the diabetes medication, there was a conflict in that testimony. I think the defendant said Agent Ryan got it for him. Agent Ryan said he didn't, but the district court didn't make a finding on that. Getting to the question of where there was a conflict in the testimony, this is just a classic situation where a district court hears all the witnesses, is able to assess their credibility, and makes a finding. The court did make a finding. If you look at Addendum 8, the court said that although it was a murky area, the court ultimately said what it found to be the defendant's unarticulated intent to arrest the defendant if he didn't cooperate. The court heard both agents' testimony, and they were quite clear in their direct testimony and redirect testimony that they never communicated that to the defendant. Admittedly, on cross and recross, they did say that, I don't recall that, but the court found that the agents didn't make that. What's the basis for the finding that they don't recall having made it? And then there's the attorney saying they said X. Judge Barron, it's two points. First off, in both direct, before you answer that, just so I get whether we're on the same premise. Assume the attorney said, assume that the agent said back to the attorney what the attorney said the agent said then. Do you agree then it was custodial? I wouldn't agree that it's custodial, but I think I would agree that it's a very, very significant factor that would have to be taken into the analysis. Okay. So now, with that understanding, going back to the finding itself, you were going to answer my question of how we say, well, what basis is there of finding that they didn't say it when all that, when the record shows that they said they don't recall it being said and the lawyer said they said it? Okay. Two points, Judge Barron. First off, both in, so Agent Pauly, both in her direct and redirect testimony was unequivocal that that was not said. And Agent Ryan, same thing on his direct examination. And as we noted, at trial, and this court can take trial testimony into account in support of a motion to suppress, when the same question was asked, like, are you saying it didn't happen or you don't recall Agent Ryan said, I don't recall that, I don't think it happened. Then on the other side of the ledger, what the court also found significant was the fact that the defendant submitted an affidavit in support of this motion to suppress. And this wasn't, as we noted in our brief, this wasn't any bare bones affidavit. It was three pages, 30 paragraphs, no mention made of the fact that the agents made any such representation. Did the lawyer, Sajak, participate in that affidavit? He did. What he testified at the suppression hearing, that he communicated with defense counsel prior to that affidavit being prepared and testified that he didn't mention this until after the affidavit was prepared. And so that's obviously something the district court could take into account in weighing the balance on this issue. In our view, there wasn't any clear error in the district court's finding, but even if this court were to find that this was at all a close call or that there's a plausible case in the defendant's view, what this court has repeatedly said is that a district court's on clear error view, a district court's choice amongst plausible views of the evidence does not amount to clear error. Just briefly on the admission of the toll records, that went to the Petroziello determination about whether or not Mr. Raphael's statements from October of 2015 would come in. They're just simply toll records. The fact that a call was placed, not the substance of any such calls, just the fact that a call was placed, it certainly isn't determinative of whether or not the conspiracy existed in October 2015, but it absolutely is probative of that fact. And I don't see how the mere fact that calls were placed, as the district court found, doesn't arise to anything approaching a Rule 403 violation, nor does it constitute prior bad acts evidence under Rule 404B. If the court doesn't have any other questions, we ask that you affirm. Thank you. I'll just very briefly respond to the part on the phone records. The Petroziello analysis, that had nothing to do with that analysis. That was a completely separate analysis. The other part of that analysis was dealt with, the statements that Carlos Raphael made to the agents, which I submit those shouldn't come in for other reasons, but they had nothing to do with the telephone records. Those telephone records, there is no basis to have telephone records outside the contours of the conspiracy to come in against Mr. Mello. There's just none. There's marginal relevance in this, and certainly its prejudicial effect outweighs any type of probative value. What is the prejudicial effect? I'm sorry? What is the prejudicial effect, given the other evidence? Well, there's a lot of evidence. You notice that Mr. Mello was acquitted of the bulk cash smuggling here. This isn't a case with overwhelming evidence. We had four witnesses who admittedly, repeatedly lied, both to the grand jury and to the government agents, and that was essentially the base of it. They didn't have any concrete proof for tracing money back, or that there had been money in the envelopes that were handed to Mr. Mello, or what was in the envelopes. So this wasn't a case of overwhelming evidence. When you start to take something like those phone records, and you try to tie them in to Carlos Raphael or to Antonio Freitas, two people who were involved in a conspiracy, that there was overwhelming evidence of their involvement in this, and you try to tie Mr. Mello into it, especially when Mr. Raphael is saying, no, no, no, not Mr. Mello, and basically disavowed his involvement in the conspiracy, and you're going to all of a sudden turn around and introduce these phone records? That cannot be harmless error under these circumstances. Counsel, I have a little bit of confusion on this point. So we're on plain error review on this particular issue? No, no, no. That was objected to. I thought the point of putting in those toll records was to show that there was a spike around November 10th. Am I mistaken about that? If that was limited to November 10th, I think that would have been okay. No, the point is you put in all the records so that you can show the spike. I don't believe that was the reason, but even if that were, those could have been much more limited. Like I said, possibly if you wanted to show something from October to December, maybe. But to go from March, all those records, 200 calls, all that shows is just some type of nefarious activity there. Just to touch on the other parts about the custodial interrogation, the fact is there are a number of things here. If the toll records had been excluded, what would the record have shown about the contact between your client and the two people that the phone records would reveal he was in contact with? Are you asking if the records had been excluded in their entirety? As much as you want excluded. Right. If it was just limited to November 10th, 2015, then it would simply show that there was contact between Mr. Freitas' phone and Mr. Mello's phone on that particular day and at the airport. I'm not necessarily suggesting that. In the absence of that, what would the record have shown about contact between the two of them? There wouldn't be any. I don't believe there would be any other than the fact that they worked together, they knew each other, and again, that's never been disputed. But the fact that they're calling each other, there's no purpose in that, especially outside the scope of the conspiracy. Was there a spike? I don't believe that was the argument that was presented. Was there a spike? I imagine, Your Honor, I'm not familiar with that part on the record. I'd have to go back and look at that. But from what I do know, there were calls made between Mr. probably more frequent calls made between Mr. Freitas and Mr. Mello on November 10th. I imagine that's probably the case, but I can't sit there and say, okay, for certain that there was a spike or not. I'm not sure. But I don't believe that was ever the government's intention in introducing this, to show that that was a spike. Just one other quick fact. I don't believe that, looking at the testimony, I don't believe that Attorney Zajac had indicated that he had helped participate in the drafting of that affidavit. But I don't have that in front of me. But that's not my recollection of the testimony. Okay, thank you both. Thank you, Your Honor.